# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 13-451


LARRY E. TOMASIK

VERSUS

LA STATE VETERANS AFFAIRS OFFICE



**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION – DISTRICT 3
PARISH OF CALCASIEU, NO. 11-02373
CHARLOTTE L. BUSHNELL, WORKERS' COMPENSATION JUDGE

**\*\*\*\*\*\*\*\*\*\***

## JIMMIE C. PETERS
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and J. David Painter, Judges.


**REVERSED AND RENDERED.**

**Marcus M. Zimmerman**
**4216 Lake Street**
**Lake Charles, LA 70605**
**(337) 474-1644**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Larry E. Tomasik**

**James D. "Buddy" Caldwell**
**Attorney General**
**Michael W. Landry**
**Assistant Attorney General**
**One Lakeshore Drive, Suite 1200**
**Lake Charles, LA 70629**
**(337) 491-2880**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **State of Louisiana, Office of Veterans Affairs**

**PETERS, J.**

The defendant in this workers' compensation case, the State of Louisiana, Office of Veterans Affairs, appeals a judgment of the workers' compensation judge (WCJ) finding that the plaintiff, Larry E. Tomasik, proved his heart attack was work-related and that he was entitled to indemnity benefits. For the following reasons, we reverse the judgment and render judgment dismissing Mr. Tomasik's claims.

## DISCUSSION OF THE RECORD

On Tuesday, February 15, 2011, Mr. Tomasik suffered a heart attack while carrying boxes into the DeRidder, Louisiana office of his employer, the Louisiana Office of Veterans Affairs (hereinafter sometimes referred to as "the state"). Mr. Tomasik functioned as a Veterans Assistance Counselor for his employer, and worked Monday, Wednesday, and Friday in the Lake Charles, Louisiana office and Tuesday and Thursday in the DeRidder office.

Mr. Tomasik maintained active files in both offices, but would often take DeRidder files to the Lake Charles office to organize them into new folders. He did so because the two days per week he spent in DeRidder were basically counseling days with little time for paperwork. With more time for administrative matters while in Lake Charles, he would organize the DeRidder files and then return them to DeRidder on the next trip. However, in late 2009 or early 2010, he received instructions from Al Leger, his supervisor, to straighten up the DeRidder office by disposing of the inactive files. This significantly increased the transportation requirements for the office files.

Because the paper shredder in the DeRidder office was inadequate for the amount of shredding required, Mr. Tomasik began transporting the inactive files from that office to the Lake Charles office where a heavy-duty shredder was

available. The inactive files, as well as the files to be reorganized, were transported to Lake Charles in boxes with dimensions of approximately four feet by two feet wide by two feet in depth. Each box, according to Mr. Tomasik, weighed between fifty and sixty pounds.

Mr. Tomasik's heart attack in February of 2011, was actually his second heart attack. One year before, in February of 2010, he had begun feeling "woozy" while unloading some boxes from his car at the Lake Charles office. This occurred approximately one month after he received the instructions from Mr. Leger to clean up the DeRidder office. He was treated at a Lake Charles hospital and remained off work for three months. When he returned to work, his activities were initially limited to the Lake Charles office. However, he returned to his old two-office schedule in January of 2011. During his absence from the DeRidder office, the files had piled up, and the office was in a state of disarray. Because he felt pressured to catch up on the necessary shredding of files, he again began transporting boxes to Lake Charles. One month later, he suffered the heart attack which is the subject of this litigation.

The evidence establishes that Mr. Tomasik's day did not begin very well on February 15, 2011. As he started to work on that morning, his vehicle would not start. This not only upset him, but it caused him to arrive at the DeRidder office a few minutes late, where veterans were already waiting on him. He unlocked the door and brought in one of the two boxes he was transporting. After bringing in this box, he felt lightheaded. He waited on the first of the waiting veterans and then returned to the vehicle for the second box. As he brought that box into the office, he began bumping into things and felt a tightness in his chest. He dropped into a chair and obtained two nitroglycerin tablets from one of the veterans. He

2

was immediately transported to nearby Beauregard Memorial Hospital in DeRidder. Mr. Tomasik had no memory of being taken to the hospital and did not recall talking to the emergency room nurse. He was subsequently admitted to its intensive care unit after it was determined by the emergency room personnel that he had suffered a heart attack and possible stroke. Later he was transferred for treatment to a Veterans Administration hospital in Houston, Texas.

Tina Sandford, Mr. Tomasik's daughter, established the time frame for the events of the morning of February 15, 2011. She had resided with her father since his first heart attack, and she testified that after getting the vehicle started, he left home for the thirty minute drive to DeRidder at approximately 8:30 a.m. She received a telephone call from her father at 9:30 a.m., wherein he asked her to look up a telephone number. At that time, according to Ms. Sandford, Mr. Tomasik's speech was slightly slurred. However, she did not find this unusual because she had observed that since his 2010 heart attack, his speech became slurred anytime he became excited or aggravated. Thirty minutes later, she received a telephone call from the DeRidder office informing her that something was wrong with her father. When she called back a few moments later, her father had been given the nitroglycerin pills, and the lady she talked to described him as being disoriented.

Ms. Sandford arrived at the hospital at approximately 11:15 a.m., and immediately provided the emergency room personnel with her father's history of having had a heart attack and stroke the year before wherein he had undergone a heart catheterization and the implantation of two stents. She denied telling the emergency room personnel that her father had complained of chest pain, shortness of breath, or any other symptoms the night before, although she did acknowledge

3

that she might have told them that he had been a little tired over the weekend after having worked in his rose bed.

On March 28, 2011, Mr. Tomasik filed a disputed claim for compensation against the state, seeking indemnity and medical benefits and penalties and attorney fees. He asserted in his pleading that his heart attack and stroke were caused by his exertions in transporting three boxes, each weighing between fifty to seventy pounds, between the Lake Charles and DeRidder offices.

The matter proceeded to a trial on the merits on August 1, 2012, after which the WCJ took the matter under advisement. On December 20, 2012, the WCJ rendered oral reasons for judgment, finding that Mr. Tomasik proved, by clear and convincing evidence, that his heart-related injury was compensable pursuant to La.R.S. 23:1021(8)(e). Accordingly, the WCJ awarded Mr. Tomasik temporary total disability for the period between February 15 and April 15, 2011, and supplemental earnings benefits for the period between April 15 and May 1, 2011. The WCJ further awarded Mr. Tomasik $2,000.00 in penalties and $6,000.00 in attorney fees based on the state's failure to pay indemnity benefits. The WCJ executed a written judgment to this effect on December 20, 2012, and, thereafter, the state perfected this appeal.

In its appeal, the state raised three assignments of error:

1.  The [WCJ] was manifestly erroneous in determining that the heart attack was a compensable injury.

2.  The [WCJ] was manifestly erroneous in determining that the heart-related problems were predominantly or majorly caused by work activity.

3.  The [WCJ] was manifestly erroneous in determining that the work activity was either exceptional nor [sic] unusual compared to other persons employed in Tomasik's profession.

4

Mr. Tomasik answered the state's appeal and requested additional attorney fees for work performed by his counsel in defending this appeal.

**OPINION**

It is well settled that the factual findings of a workers' compensation judge are reviewed pursuant to the manifest error—clearly wrong standard of appellate review. *Poissenot v. St. Bernard Parish Sheriff's Office*, 09-2793 (La. 1/9/11), 56 So.3d 170. Normally, an injured worker is only required to prove that he suffered a work-related injury by a preponderance of the evidence. However, in order to prove a heart-related or perivascular work injury, the burden of proof is elevated to clear and convincing evidence. La.R.S. 23:1021(8)(e).

Louisiana Revised Statutes 23:1021(8)(e) provides:

> **Heart-related or perivascular injuries**. A heart-related or perivascular injury, illness, or death shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter unless it is demonstrated by clear and convincing evidence that:
>
> (i) The physical work stress was extraordinary and unusual in comparison to the stress or exertion experienced by the average employee in that occupation, and
>
> (ii) The physical work stress or exertion, and not some other source of stress or preexisting condition, was the predominant and major cause of the heart-related or perivascular injury, illness, or death.

In her oral reasons for judgment, the WCJ did not set forth with particularity the facts upon which she relied to conclude that Mr. Tomasik had met his burden of proof under La.R.S. 23:1201(8)(e). Rather, the WCJ stated generally that:

> Based on the evidence presented, the Court finds that the claimant has carried his burden of proof by clear and convincing evidence that his physical work stress or exertion accelerated, aggravated, and made worse the claimant's heart attack or injury. Claimant's argument is supported by the evidence the claimant suffered a compensable heart attack.

The Louisiana Supreme Court set forth the parameters for determining whether the compensability of a heart attack in the case of Etta D. Harold v. LaBelle Maison Apartments, 643 So.2d 752 (La. 10/17/94). The Harold court recognized that the statute, La. R.S. 23:1201 [sic], makes it more difficult for a claimant to prove that the heart-related or perivascular injuries suffered on the job are compensable. However, that court held that the statute should not be construed to preclude recovery of workers' compensation benefits simply because the claimant suffers from previously unknown but undoubtedly existent coronary artery disease. The Court found that as long as such a claimant meets the heightened burden of proof imposed by the amended statute, he or she can recover.

In this case, Tomasik proved by clear and convincing evidence that the lifting of the heavy boxes at the mandate of his employer, collapsing in a chair after he set boxes down, combined with the medical evidence that indicated that lifting the boxes accelerated the symptoms of the heart attack so much so that the claimant had to be immediately taken to the emergency room.

In *Harold v. La Belle Maison Apartments*, 94-889, pp. 5-6 (La. 10/17/94), 643 So.2d 752, 755, the supreme court discussed the first prong of the two-pronged inquiry required of La.R.S. 23:1201(8)(e),[1] and explained:

The first prong of the amended statute requires plaintiff to prove by clear and convincing evidence that the physical work stress she experienced was extraordinary and unusual in comparison to the stress or exertion experienced by the average employee in that occupation. La.R.S. 23:1021(7)(e)(i). "Extraordinary" is defined as "going beyond what is usual, regular, or customary." Webster's New Collegiate Dictionary (1977). "Unusual" is defined as "not usual" and "uncommon;" that is, not in accordance with usage, custom, or habit. *Id.* As is apparent from these definitions, the terms "extraordinary" and "unusual" have similar meanings. We hold that these terms require plaintiff to prove that her physical work stress went beyond what was usual, regular or customary in relation to the average employee in that occupation.

In *Harold*, the claimant was a maintenance worker at the apartment complex and had begun to suffer severe pains in her chest and back after removing grass from the cracks in the sidewalk on a hot August day. When she reported her condition to the apartment manager, he responded by handing her a work order for the repair

---

[1] At the time of the plaintiff's workers' compensation claim in *Harold*, La.R.S. 23:1201(8)(e) was designated as La.R.S. 23:1021(7)(e).

6

of a toilet and dishwasher in an upstairs apartment. Still in pain, she performed those repairs and, shortly thereafter, collapsed and was rushed to a hospital where she was diagnosed as having had a heart attack. The supreme court concluded that the claimant had met her burden of proof under the first prong of La.R.S. 23:1021(8)(e) in that "[b]eing required to perform physical labor while in pain is not usual, regular, or customary for maintenance workers, which was Mrs. Harold's occupation." *Id.* at 755-56.

In the matter before us, the job description for a Veterans Assistance Counselor states that "[t]he incumbent functions in a public relations capacity in the parish where assigned. Incumbent may operate itinerant offices in parishes other than where position is domiciled, when required." Of the six duties listed, there is only one under which the task Mr. Tomasik was performing might fit:

> Maintains current records on all transactions and files correspondence in veterans files or other proper places: prepares and submits periodic written reports reflecting the total office production. Maintains office safety records, reference manuals, and office equipment.

Included at the end of the job description is the catch all statement, "Performs other related duties as required." In relation to transporting the files from one office to another, Mr. Tomasik testified that the only instruction he received was that he was to shred the inactive files.

Mr. Tomasik, who was sixty-three-years old at the time of this incident, testified that before being instructed in early 2010, to shred the inactive files, the only files he would transport between the Lake Charles and DeRidder offices were the approximately fifteen files he might be working on at any given time. It was only after receiving these instructions from Mr. Leger that lifting and transporting fifty to sixty pound boxes became a part of Mr. Tomasik's duties. Mr. Tomasik

was only aware of one other counselor who transported files between offices as he did, and he did not believe that even that counselor did so on a regular basis.

On the other hand, Mr. Leger, who at the time of the incident was the Southwest Regional Manager for the Office of Veterans Affairs, testified that he supervised all of the offices in that region of the state including the Lake Charles and DeRidder offices. According to Mr. Leger, the duties being performed by Mr. Tomasik on February 15, 2011, were not above and beyond the usual job duties required of his position. Additionally, he did not believe that the stress caused to Mr. Tomasik in moving the boxes was exceptional or that it exceeded that experienced by other counselors employed by the Office of Veterans Affairs. Mr. Leger explained that offices such as the DeRidder office are not fully staffed by the state and that employees working at these offices are required to transport files from these smaller offices to the larger ones.

The supreme court in *Harold* also discussed the second prong of the two-prong inquiry, stating that it "requires [the claimant] to prove by clear and convincing evidence that her physical work stress or exertion, and not some other source of stress or preexisting condition, was the predominant and major cause of her myocardial infarction." *Id.* at 756. In addressing the defendant's argument in *Harold*, that the claimant was not entitled to indemnity benefits because her pre-existing significant blockage would have caused a heart attack sooner or later, the supreme court stated:

> First, a heart attack claimant's case does not fail simply because the medical expert cannot definitively state what the primary cause of the heart attack was. Second, the defendant's argument is essentially that, because [the plaintiff] had a previously unknown but undoubtedly existent heart disease, which prompted [the doctor] to conclude that her heart attack was inevitable, this condition must have been the primary cause of her heart attack, so she cannot recover. We disagree. In our opinion, the legislature did not intend this result when it

8

inserted the term "preexisting" in La.R.S. 23:1021(7)(e)(ii). To deny recovery to all heart attack claimants who have existent but unknown coronary artery disease would basically mean that no heart attack claimants would recover. Allowing the discovery of occluded arteries after the fact of a heart attack to preclude recovery of worker's compensation benefits is an overbroad reading of the statute. We do not think the legislature intended to eliminate all individuals with coronary artery disease from coverage of the worker's compensation laws. Instead, it made such claims more difficult to prove by adding the heightened requirements of La.R.S. 23:1021(7)(e). Statutes must be construed in a manner to effectuate their purpose. *Smith v. Cajun Insulation, Inc.*, 392 So.2d 398, 400 (La.1980). In addition, it is well settled that worker's compensation laws must be given a liberal interpretation. *Daigle v. Sherwin-Williams Co.*, 545 So.2d 1005, 1006 (La.1989). Applying these principles, we hold that La.R.S. 23:1021(7)(e) must not be construed to preclude recovery of worker's compensation benefits simply because the claimant suffers from previously unknown but undoubtedly existent coronary artery disease. As long as such a claimant meets the heightened burden of proof imposed by the amended statute, he or she can recover.

*Id.* at 757.

In *Harold*, the claimant had performed heavy physical labor for over fifteen years and never experienced symptoms of cardiac difficulties. Although some significant blockage was apparently discovered after the fact of the heart attack, no physician had ever told her that she suffered from cardiac problems, and she did not even exhibit any of the danger signs of cardiac problems. With regard to causation, the claimant's treating physician testified "that the delay [she] experienced in receiving medical treatment combined with her continued work while in the onset of a heart attack exacerbated the injuries to her heart." *Id.* at 756.

The medical evidence in the matter before us was provided by Dr. Robin Yue, a board certified cardiologist from DeRidder; Dr. Steven J. Snatic, a Lafayette, Louisiana, neurologist; and Dr. Jerome Arimura, a Lake Charles general practitioner. Both Dr. Yue and Dr. Snatic were of the opinion that Mr. Tomasik's activities in lifting the boxes did not cause his heart attack. Dr. Arimura was of the opinion that it did cause his heart attack.

Dr. Arimura examined Mr. Tomasik and reviewed some of his medical records in reaching the conclusion that "the patient clearly should not have been doing any work that required much of any physical exertion, including moving boxes weighing 50-70 lbs" and "more likely than not" the heart attack and stroke he suffered on February 15, 2011, as well as five subsequent syncopal episodes, and one subsequent cardiac event "were precipitated by the moving of the boxes." Dr. Arimura based his opinion primarily on his review of Mr. Tomasik's medical records, which revealed an extensive history of inoperable diffuse coronary artery disease, type II diabetes mellitus, hypercholesterolemia, hypertriglyceridemia, heart failure, heart blockage, chronic obstructive pulmonary disease, restrictive lung disease, chronic renal failure, and probable strokes. Dr. Arimura did acknowledge in his medical report that he had not reviewed the records of the Veterans Administration hospitalization and that "the records of the interim hospitalization at the VA Hospital in Houston were not available that might shed light on whether or not the patient indeed suffered another stroke."

Dr. Yue, on the other hand, concluded that Mr. Tomasik had already suffered his heart attack before arriving in DeRidder on the morning of February 15, 2011, and that the heart attack was not caused by him lifting the boxes. He first became involved with Mr. Tomasik's evaluation and treatment on the morning of February 15, 2011, when he was contacted by Dr. James Oglesby, the emergency room doctor at Beauregard Memorial Hospital. Dr. Oglesby informed Dr. Yue of Mr. Tomasik's complaints of chest pain and his abnormal EKG results, and, after listening to Dr. Oglesby's report, Dr. Yue agreed with his diagnosis that Mr. Tomasik had suffered a heart attack. Based on this agreed-upon diagnosis, the two doctors determined how to initially move forward in the treatment. Thirty

minutes after his conversation with Dr. Oglesby, Dr. Yue arrived at the hospital and immediately noted that Mr. Tomasik was very lethargic and unable to provide him with a history. Based on this finding, he concluded that Mr. Tomasik had also suffered a stroke.

In reviewing the results of the blood work performed in the emergency room, Dr. Yue noted that the patient's Troponin and CPK-MB levels were both elevated. He explained that CPK-MB, which is a cardiac enzyme, is released when the heart muscle suffers damage and that both the CPK-MB and the Troponin levels will elevate and peak and then subside within twenty-four hours after the occurrence of a heart attack. This allows physicians to better pinpoint the actual time a heart attack occurs.

The medical personnel continued to check the two levels, and the blood samples taken at 5:00 p.m. on that day revealed that Mr. Tomasik's CPK-MB and Troponin levels were 323 and 4.46, respectively. According to Dr. Yue, the normal level for CPK-MB is less than 180, and the normal level for Troponin is 0.04. Based on these levels, Dr. Yue estimated that Mr. Tomasik's heart attack occurred between four to six hours previously. He stated that the earliest time the heart attack could have occurred was less than twenty-four hours, but the latest time was four hours prior to the blood test. That being the case, he initially estimated that Mr. Tomasik's heart attack occurred no later than 1:00 p.m.

However, when Dr. Yue reviewed the blood test results from midnight that same day, he noted that Mr. Tomasik's total CPK had decreased to 248. Based on this finding, he changed the window for the heart attack to between 3:00 to 4:00 a.m. and noon of February 15, 2011, again explaining that the total CPK level

usually starts dropping twenty hours after the occurrence of a heart attack and that most heart attacks occur between midnight and the early morning hours.

Dr. Yue's conclusion concerning the time frame for Mr. Tomasik's heart attack involved the fact that both the emergency room doctor and nurse had reported that Mr. Tomasik began suffering chest pain during the night of February 14, 2011. He suggested that his diagnosis could best be described as that of acute coronary syndrome because it contains aspects of a heart attack combined with unstable angina. Dr. Yue explained that the process leading up to such an event begins with plaque rupturing and blocking an artery. This, according to the doctor, would be the unstable angina phase, but it and the impending heart attack are a continuous sequence. Given the history provided to him, he was of the opinion that the angina phase began the evening before.

Dr. Yue's diagnosis caused him to conclude that the box-lifting activity did not cause Mr. Tomasik's heart attack, although it may have caused his symptoms to worsen based on an increase in his heart beat in correlation to the decreased flow of oxygen in his blood caused by the blockage. Still, according to the doctor, once the heart muscle is damaged, strenuous activity will induce an increased heart rate, but this is a complication which would not further damage the heart muscle. According to Dr. Yue, had Mr. Tomasik called in sick on the morning of February 15, 2011, he would still have suffered a heart attack.

Dr. Snatic reviewed Mr. Tomasik's medical records at the request of the state and agreed with Dr. Yue's conclusion that Mr. Tomasik's heart attack was not caused by his activity in lifting the boxes. In his report submitted into evidence, Dr. Snatic reached the following conclusions:

1.) The "incident" of February 15, 2011 which led to Larry Tomasik's admission to Beauregard Memorial Hospital was an

12

interruption of the blood supply to his brain, involving the vertebrobasilar circulation, which ultimately resulted in fixed neurological deficit (an ischemic infarct or non hemorrhagic stroke) [see 7C][.]

A.) This was immediately recognized by Robin Yue upon his first person contact with Mr. [Tomasik] at Beauregard Memorial Hospital (his prior impression of an acute cornary [sic] syndrome as the reason for admission was based on a telephone conversation.

B.) This is documented by C.T. brain scan reported February 19, 2011 which report describes a subacute cerebellar ischemic infarct and by MRI brain scan reported February 24, 2011 which report describes recent infarcts within the left thalamic pulvinar, midbrain, cerebellar, vermis, the bilateral hemisphere (right greater than left) as well as other abnormalities within the vetebrobasilar [sic] distribution. MRA of the head reported on the same date which report indicates a "focal fenestration of the basilar artery" just above the confluence of the vertebral arteries. All of these studies were done a[t] V.A. Houston Medical Center.

C.) A stroke involving the vertebrobasilar symptom was recognized by the neurologists who attended him at the V.A. Medical Center Houston in February 2011.

2.) The stroke which occurred on February 15, 2011 was not caused by physical activity[.]

A.) There is little to no evidence that ischemic strokes are caused by physical activity.

3.) There is evidence that Mr. Tomasik had a posterior circulation stroke about a year earlier in 2010. (See neurology attending note of 2/21/2011 from V.A. Medical Center Houston). See Christus St. Patrick's medical records 2/2010 including MRI Brain dated 2/17/2010 and discharge summary diagnosis of "acute cerebrovascular accident" and "left sided weakness secondary to acute cerebrovascular accident" among others.

4.) Mr. Tomasik's two strokes, the one of 2/2010 and the one of 2/2011 are in the same vascular territory (ie: the vertebrobasilar territory). It is therefore likely that both have the same underlying cause. It is my opinion that cause, more likely than not, lies in the "fenestration" of the basilar artery described in the MRA brain scan of 2/24/2011 done at the V.A. Medical Center in Houston. I believe this area served as a site of

13

thrombus formation and subsequent embolization accounting for multiple ischemic infarcts.

5.)     The possibility of embolic infarction from elsewhere such as the heart is remote.

    A.)     About 90% of embolic strokes originating in the heart affect the carotid circulation, only 10% affect the vertebrobasilar circulation. The odds of cardiac emboli finding the vertebrobasilar system on two occasions a year apart would seem to be a[b]out 10% of 10% or a[b]out 1%.

6.)     It is indisputable that Mr. Tomasik has multiple risk factors that would predict the likeihood [sic] of cardiovascular disease and cerebrobvascular [sic] disease. These include diabetes mellitus, hypertension and hyperlipidemia. Indeed, after an episode of 'atypical chest pain", he was found to have diffuse coronary disease in 2/2010 and had a coronary stent placed. At that time the EKG was normal, cardiac enzymes were normal, ".... recent coronary disease" was included in the final diagnosis. The medical records from that admission make no mention of any activity or work related to the episode of 2/2010 (Christus St. Patrick Hospital).

7.)     Upon admission to Beauregard Memorial Hospital, Mr. Tomaski [sic] reportedly complained of chest pain, had an abnormal EKG and subsequently was found to have elevated CKMB and Troponin all suggestive of an acute coronary syndrome. Dr. Yue believed symptoms began "the night before" but the time of the onset appears to be in dispute. Nevertheless, Mr. Tomasik was initially treated for an acute coronary syndrome…until he was later recognized as having had a stroke.

    A.)     He had symptoms and signs of heart disease and stroke.

    B.)     There is no reason an individual with multiple risk factors for vasculr [sic] disease and a prior history of both coronary artery disease and stroke could not have both in the same 24 hour period.

    C.)     His initial symptoms, on 2/15/2011, of dizziness, loss of balance, and loss of consciousness are typical of vertebrobasilar ischemia and stroke.

    D.)     Occasionally strokes appear to be capable of causing EKG changes and elevation of cardiac enzymes. This may be due to marked elevation of adrenalin which is thought by some to be cardiotoxic. I do not know

14

whether this explains the con-incidence [sic] of stroke and "acute coronary syndrome" in this case. (See 9).

8.) Dr. Arminara [sic] has reported that he believes that "moving boxes" on 2/15/2100 precipitated Mr. Tomaski's [sic] stroke of 2/15/2011, subsequent syncopal episodes at V.A. Medical Center Houston and a subsequent stroke at Christus St. Patrick in March 2012 as well as the cardiac event of 2/15[]/2012. These conclusions seem to be <u>way above</u> his level of education and experience (he is a G.P., not a Cardiologist and not a Neurologist) and cannot be supported by clear and convincing <u>evidence</u> in the medical literature or elsewhere.

9.) The fact that Mr. Tomaski [sic] had an elevated CPK on admission to Beauregard Memorial is not in dispute. An elevated CPKMB is indicative of myocardial damage. I will defer to Dr. Yue for his conclusion regarding the significance of his finding.

We find that the WCJ erred in concluding that Mr. Tomasik carried his enhanced burden of establishing that the physical work stress to which he was subjected was extraordinary and unusual in comparison to that experienced by the average counselor working for the Office of Veterans Affairs or that it was the predominant and major cause of his heart-related medical condition as required by La.R.S. 23:1021(8)(e). With regard to the first element of the two-prong burden of proof, the evidence established that Mr. Tomasik's employment duties included "[m]aintain[ing] current records on all transactions and files correspondence in veterans files or other proper places" as well as "related duties as required." This would clearly include the duty to properly dispose of inactive files. Mr. Tomasik testified that he was already transporting some individual files between the two offices on a regular basis before he was instructed to begin the process of disposing of inactive files. While Mr. Tomasik testified that he was only aware of one other counselor who had the same transportation obligations, Mr. Leger explained that many of the smaller offices are not fully staffed and all of the counselors working

15

at these offices had the same duties as Mr. Tomasik.  The burden of proof on this issue is clear and convincing, and we do not find that Mr. Tomasik met that burden.

Furthermore, the medical evidence submitted by Mr. Tomasik does not meet the clear and convincing burden of proof required in La.R.S. 23:1201(8)(e)(ii).  Dr. Arimura's opinion that Mr. Tomasik's heart attack was precipitated by his moving the boxes was based on a "more likely than not" standard.  Thus, Mr. Tomasik failed to meet his burden on this issue as well.

Because we find that the WCJ judgment should be reversed, we need not consider Mr. Tomasik's request for attorney fees on appeal

## DISPOSITION

For the foregoing reasons, we reverse the judgment of the workers' compensation judge rendered in favor of Larry Tomasik and against the State of Louisiana, Office of Veterans Affairs; and we render judgment in favor of the State of Louisiana, Office of Veterans Affairs and against Larry Tomasik, dismissing all of his claims against that entity.  We assess all costs of these proceedings against Larry Tomasik.

**REVERSED AND RENDERED.**